IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| NORMENT SECURITY GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.  2:08-CV-533-WKW[WO] |
| | ) | |
| GRANGER NORTHERN, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is a Motion to Dismiss (Doc. # 13), filed by the five named Defendants.  In their motion, which is accompanied by a brief and evidence (Docs. # 13 & 14), Defendants seek dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.  Plaintiff filed a Brief in Opposition, which is accompanied by evidence (Doc. # 18), and Defendants replied (Doc. # 19).  After careful consideration of the arguments of counsel, the applicable law and the record as a whole, the court finds that the motion is due to be granted.

## I. SUBJECT MATTER JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and § 1441.  The amount in controversy exceeds $75,000, and there is complete diversity of citizenship between Plaintiff and Defendants.  The parties do not dispute subject matter jurisdiction or venue, and there is an adequate basis for both.

## II.  STANDARD OF REVIEW

A Rule 12(b)(2) motion tests the court's exercise of personal jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2).  "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *United Techs. Corp. v. Mazer*, ___ F.3d ___, 2009 WL 263329, at *8 (11th Cir. 2009); *see also Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999) ("A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction.").  If the plaintiff satisfies his initial burden and the defendant then challenges personal jurisdiction "by submitting affidavit evidence in support of its position," *United Techs. Corp.*, ___ F.3d at ___, 2009 WL 263329, at *8, "'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction,'" *id.* (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268 (11th Cir. 2002)); *see also Posner*, 178 F.3d at 1214 ("The plaintiff bears the burden of proving 'by affidavit the basis upon which jurisdiction may be obtained' only if the defendant challenging jurisdiction files 'affidavits in support of his position.'" (citation omitted)).  When the issue of personal jurisdiction is decided on the evidence, but without a discretionary hearing, a plaintiff demonstrates a "prima facie case of personal jurisdiction" by submitting evidence sufficient to defeat a motion made pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.  *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir. 2006).  At this evidentiary juncture,

the court construes the complaint's allegations as true if they are uncontroverted by affidavits or deposition testimony, *id.* at 1317, and where there are conflicts, the court "construe[s] all reasonable inferences in favor of the plaintiff," *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 199 F. App'x 738, 741 (11th Cir. 2006) (quoting *Meier,* 288 F.3d at 1269).

### III.  FACTS

The following facts are presented in accordance with the standard of review set out above.  Plaintiff Norment Security Group, Inc. ("Norment") is an Alabama corporation with its principal place of business in Alabama.  (Compl. ¶ 1 (Ex. (unnumbered) to Doc. # 1).) It is a contractor that provides security products and services for correctional institutions, courthouses, and other government and commercial facilities.  (Stanley W. Sasser ("Sasser") Aff. ¶ 3 (Ex. B to Opp'n to Mot. Dismiss (Doc. # 18)).)[1]  Norment maintains regional offices outside of the state of Alabama, including at all times pertinent to this lawsuit, an office in Hanover, Maryland.  (Sasser Aff. ¶ 4.)

There are five Defendants, and all are citizens of states other than Alabama.  (Compl. ¶¶ 2-6.)  Defendant Granger Northern, Inc. ("Northern") and Defendant R. W. Granger & Sons, Inc. ("Granger") both are "in the business of general contracting."  (Robert W. Granger Jr. Aff. ¶¶ 3-4 (Ex. A to Mot. Dismiss (Doc. # 13)); Compl. ¶¶ 2-3.)  Northern is incorporated in Maine with its principal place of business also in Maine.  (Compl. ¶ 2; Robert W. Granger Jr. Aff. ¶ 3.)  Granger is a citizen of Massachusetts, where it is incorporated and has its

_____

[1] Mr. Sasser is Norment's vice president for finance and administration.  (Sasser Aff. ¶ 1.)

principal place of business.  (Compl. ¶ 3; Robert W. Granger Jr. Aff. 4.)  The individual Granger Defendants – Robert W. Granger Jr. and Stephen J. Granger – were "at all times material to this action" officers and/or directors of Northern and Granger.[2]  (Compl. ¶¶ 4-5 & 53; *see also* Exs. 1 & 2 to Michael C. Griffin ("Griffin") Aff. (Ex. A to Opp'n to Mot. Dismiss) (annual reports and corporate filings listing individual Granger Defendants as officers and/or directors of Northern and Granger).)  The individual Granger Defendants are citizens of Massachusetts.  (Robert W. Granger Jr. Aff. ¶ 2; Stephen J. Granger Aff. ¶ 2 (Ex. B to Mot. Dismiss).)  Defendant Consigli Northern, Inc. ("Consigli") is a general contractor. (Compl. ¶ 6; Ex. 4 to Griffin Aff.)  According to its vice president, J. Scott Lerner ("Mr. Lerner"), Consigli was incorporated in Maine in May, 2004, for the purpose of assuming the rights and obligations of Northern under three contracts, not directly related to this litigation, for construction projects in the state of Maine.  (Lerner Aff. ¶ 2 (Ex. C to Mot. Dismiss); *see also* Compl. ¶¶ 47-48.)

This lawsuit arises from subcontracts pertaining to three public works construction projects located in Vermont, Massachusetts, and New Hampshire.  (Compl. ¶¶ 9-11.)  On April 8, 2002, Norment and Northern entered into a subcontract ("Vermont Subcontract") pursuant to which Norment agreed to provide labor, equipment and materials in connection with the construction and commissioning of certain security systems to be installed at the

---

[2] To avoid confusion, Robert W. Granger Jr. and Stephen J. Granger are referred to individually by their full names and collectively as the "individual Granger Defendants."  References to "Defendants" are to all named Defendants.

Southern State Correctional Facility in Springfield, Vermont ("Vermont Project"). (Compl. ¶ 9.) On June 18, 2002, Norment and Granger entered into a subcontract ("Massachusetts Subcontract") pursuant to which Norment agreed to provide labor, equipment and materials in connection with the construction and installation of certain detention equipment and security systems at the Barnstable County Jail & House Correction in Bourne, Massachusetts (the Massachusetts Project). (Compl. ¶ 10.) On September 3, 2003, Norment and Northern entered into a subcontract ("New Hampshire Subcontract") pursuant to which Norment agreed to provide labor, equipment and materials in connection with construction and installation of certain detention equipment and security systems at the Merrimack County House of Corrections in Boscawen, New Hampshire ("New Hampshire Project"). The owner of each project is the respective state in which the facility is located.

In June 2005, a dispute arose between Norment and Northern concerning the New Hampshire Project. (Compl. ¶ 12; Sasser Aff. ¶ 16.) Northern asserted that it was entitled to recover certain liquidated damages from Norment pursuant to the New Hampshire Subcontract. (Compl. ¶ 12.) Norment, however, disputed Northern's liquidated damages assessment and maintained that it was entitled to recover all amounts due from Northern under the New Hampshire Subcontract, without any deductions for liquidated damages or other charges. (Compl. ¶ 12.) As a result of this dispute, Northern and Granger withheld all payments owed to Norment under all three subcontracts – the New Hampshire Subcontract, the Vermont Subcontract and the Massachusetts Subcontract. (Compl. ¶ 13; Sasser Aff.

¶ 16.)  While payment was being withheld, it is alleged that the individual Granger Defendants, "exercising their total control over . . . Northern, caused Northern to sell" three of Northern's contracts to Consigli "at far less than fair market value," (Compl. ¶ 14), specifically, for less than one percent of the face amount of the contracts (Opp'n to Mot. Dismiss 4 (citing Ex. 6 to Griffin Aff.)).  It is undisputed that the three contracts Northern sold to Consigli are not the subcontracts at issue in this litigation, (Lerner Aff. ¶ 2; Compl. ¶ 14), but Norment alleges that Northern's sale of these three (unrelated) contracts to Consigli "further threaten[ed] Northern's ability to continue in business and pay its legitimate creditors, including [Norment]" (Compl. ¶ 14).

Seeking legal recourse, Norment filed this lawsuit against Defendants in the Circuit Court of Montgomery County, Alabama, on June 6, 2008.  (Compl.)  The case was removed to federal court, timely and with all Defendants consenting, on the basis of diversity jurisdiction, *see* 28 U.S.C. §§ 1332(a), 1441(b).  (Not. Removal (Doc. # 1).)  Norment's complaint alleges breach of contract claims against Northern and Granger (Counts 1 and 2), an alter ego claim against the individual Granger Defendants (Count 3), a claim for intentional interference with contractual relations against Northern and the individual Granger Defendants (Count 4), a conversion claim against Northern, Granger, and the individual Granger Defendants (Count 5), a fraudulent transfer claim against Northern, Consigli, and the individual Granger Defendants (Count 6) and a claim for deceptive trade

practices against Northern and the individual Granger Defendants (Count 7).[3]  (*See generally*
Compl. ¶¶ 17-59.)

Defendants responded by filing the instant motion to dismiss, pursuant to Rule
12(b)(2) of the Federal Rules of Civil Procedure, alleging that their contacts with Alabama
are insufficient to subject them to personal jurisdiction in an Alabama federal court.  In
support of their motion, Defendants submitted affidavits from the individual Granger
Defendants and Mr. Lerner, as well as certificates from the secretary of state for the state of
Alabama.  (*See* Robert W. Granger Jr. Aff.; Stephen J. Granger Aff.; Lerner Aff.; Certificates
(Ex. D to Mot. Dismiss).)  As detailed in Defendants' evidence, the individual Granger
Defendants, citizens of Massachusetts, never have conducted any business in the state of
Alabama or been licensed or authorized to do business in Alabama.  (Robert W. Granger Jr.
Aff. ¶ 2; Stephen J. Granger Aff. ¶¶ 2-3.)  Nor have they ever owned property in Alabama,
paid taxes in Alabama, or maintained an Alabama mailing address or bank account.  (Robert
W. Granger Jr. Aff. ¶ 2; Stephen J. Granger Aff. ¶ 3.)  Robert W. Granger Jr. did not
"active[ly] participat[e]" in the bidding of the subcontracts at issue or in the awarding of

---

[3] Prior to the removal, Norment filed a motion to stay pending arbitration.  (Mot. Stay (Ex. A to
Not. Removal).)  As grounds for the motion to stay, Norment argues that the breach of contract claims in
Counts 1 and 2 must be arbitrated in accordance with the terms of the arbitration provisions contained in
each of the three subcontracts at issue.  (Mot. Stay ¶¶ 2, 4 & 6.)  Norment contends that Northern and
Granger "have refused to participate in any manner in the arbitration proceedings" (Mot. Stay ¶ 12), and
given that refusal, "Norment was forced to file the present action . . . in order to adequately protect its
interests" (Mot. Stay ¶ 15).  This opinion addresses only the motion to dismiss for lack of personal
jurisdiction, not the motion to stay.  *See Posner*, 178 F.3d at 1214 n.6 ("A court without personal
jurisdiction is powerless to take further action.").

those subcontracts to Northern, (Robert W. Granger Jr. Aff ¶ 6), nor did Stephen J. Granger (Stephen J. Granger Aff. ¶ 6).

Neither Northern nor Granger has performed any general contracting in the state of Alabama or been licensed or authorized to do business in Alabama. (Robert W. Granger Jr. Aff. ¶¶ 3-4.) Northern and Granger never have owned property in Alabama, had a mailing address in Alabama, opened a bank account in Alabama, or paid taxes in Alabama. (Robert W. Granger Jr. Aff. ¶¶ 3-4.) Northern and Granger also never have advertised in Alabama or had any employees or agents who are citizens of the state of Alabama. (Robert W. Granger Jr. Aff. ¶¶ 3-4.)

Consigli, a citizen of Maine,[4] "had absolutely no involvement" with the Vermont Project, the New Hampshire Project or the Massachusetts Project. (Lerner Aff. ¶ 4.) It has not had any business dealings with Norment in Alabama. (Lerner Aff. ¶ 5.) It also never has provided any construction-related services in the state of Alabama or been licensed or authorized to do business in Alabama. (Lerner Aff. ¶ 3.) Consigli does not own and has not owned property in Alabama. (Lerner Aff. ¶ 3.) It has never had a mailing address in Alabama, had a bank account in Alabama, paid taxes in Alabama, advertised in Alabama, or employed an Alabama worker. (Lerner Aff. ¶ 3.)

Norment also has submitted evidence in opposition to the motion. (Griffin Aff.; Sasser Aff.) That evidence establishes that each of the three subcontracts was "executed"

---

[4] Consigli was incorporated in Maine and maintains its principal place of business in that state. (Lerner Aff. ¶ 2.)

by Norment at its headquarters in Montgomery, Alabama. (Sasser Aff. ¶ 8.) Moreover, the payments owed by Granger and Northern, pursuant to the three subcontracts, were to be paid into a single account controlled by Norment at its corporate headquarters in Alabama. (Sasser Aff. ¶ 17.)

Particular to the Massachusetts Subcontract, on different occasions during an approximate two-year period, Granger "transmitted" five documents pertaining to the subcontract to Norment in Montgomery, Alabama, and there were "several telephone conversations" between Granger and personnel with Norment's sales and estimating department in Montgomery, Alabama, related to the Massachusetts Project. (Sasser Aff. ¶ 10.) Moreover, Norment "completed" more than one-third of the "total scope [of] work related to security electronics for the Massachusetts Project at its headquarters in Montgomery, Alabama." (Sasser Aff. ¶ 12 (brackets added).) That work included "the conduit and integration of the programmable logical controller (PLC) closed circuit television system, locking control, paging system, and personnel duress system." (Sasser Aff. ¶ 12.) Also, three invoices submitted by Norment requested that payments be sent to its Montgomery, Alabama address. (Sasser Aff. ¶ 10.) As to the New Hampshire Subcontract, in April 2004, Northern transmitted "drawings" and "other correspondence" to Norment in Alabama. (Sasser Aff. ¶ 13.) Between February 2003 and January 2004, three documents pertaining to the Vermont Subcontract were transmitted from Northern to Norment in

Alabama, and two of Norment's invoices to Northern requested that payments be remitted to Norment's Montgomery, Alabama address (Sasser Aff. ¶ 14).

## IV. DISCUSSION

In a diversity action, the court "undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute, and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *United Techs. Corp.*, ___ F.3d at ___, 2009 WL 263329, at *8.  Because Alabama's long-arm provision, Rule 4.2(a) of the Alabama Rules of Civil Procedure, is coextensive with due process requirements, *see Ala. Waterproofing Co. v. Hanby*, 431 So. 2d 141, 145 (Ala. 1983), the court need only consider whether the exercise of jurisdiction satisfies the requirements of due process, *Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 830 (11th Cir. 1992).  Due process requires: (1) that the defendant have "certain minimum contacts" with the forum state, and (2) if such minimum contacts exist, that the exercise of jurisdiction over the defendant "'does not offend traditional notions of fair play and substantial justice.'" *Burnham v. Superior Court of Calif.*, 495 U.S. 604, 618 (1990) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "This two-part test embodies the controlling due process principle that a defendant must have 'fair warning' that a particular activity may subject it to the jurisdiction of a foreign sovereign." *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1545 (11th Cir. 1993).

Defendants assert that the allegations of the complaint, taken as true, do not satisfy Norment's burden to "establish that [] [D]efendants have sufficient minimum contacts with Alabama to support the exercise of personal jurisdiction."[5]  (Br. in Supp. Mot. Dismiss 5 (Doc. # 14); *see also* Br. in Supp. Mot. Dismiss 4 n.3 & 9.)  Alternatively, they submit "[a]dditional facts," principally in the form of affidavits, which Defendants say support their

---

[5] Norment has not addressed Defendants' arguments challenging the sufficiency of the complaint's allegations, notwithstanding that in this circuit a plaintiff bears "the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp.*, ___ F.3d at ___, 2009 WL 263329, at *8; *see id.* (concluding that the complaint's "allegations appear to be sufficient to establish a prima facie case for the exercise of personal jurisdiction over [the non-resident defendants]" and proceeding to an analysis of the evidence).  Rather, Norment relies on its evidence to defeat the motion to dismiss, but it is dubious whether the complaint's allegations are sufficient to satisfy Norment's initial pleading burden.

The jurisdictional section of the complaint alleges only that the "court has jurisdiction over the subject matter and *the parties to this action*."  (Compl. ¶ 7 (emphasis added).)  This allegation is wholly conclusory, *see Snow*, 450 F.3d at 1317 (observing that plaintiff "relies solely on vague and conclusory allegations presented in his complaint, which are insufficient to establish a prima facie case of personal jurisdiction over [the non-resident defendant]" (brackets added) (internal footnote omitted)), and, thus, adds nothing of substance to the personal jurisdiction analysis.  The fact that an out-of-forum defendant entered into a contract with a citizen of the forum state, a fact revealed in the complaint, is not a constitutionally significant contact in and of itself.  The Supreme Court of the United States has answered the question "whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).  It said, "[W]e believe the answer clearly is that it cannot."  *Id.*  There simply are no other facts in the complaint which shed light on the jurisdictional question at hand.  *See, e.g., id.* at 479 (providing that factors relating to the contract formation that are salient to the personal jurisdiction analysis include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing").

The court, however, need not decide whether the complaint's allegations alone are sufficient to establish a *prima facie* case of jurisdiction over each Defendant under the "contracts-oriented 'minimum contacts' test," *Licciardello v. Lovelady*, 544 F.3d 1280, 1286 (11th Cir. 2008), because even assuming that Norment satisfies its initial pleading burden, the evidence, when considered in conjunction with the uncontroverted allegations, falls short of bringing any defendant within the personal jurisdiction of the court.  Moreover, whether one looks solely to the complaint's allegations or to the evidence, as discussed *infra*, Norment's reliance on the "effects test" set out in *Calder v. Jones*, 465 U.S. 783 (1984), for the proposition that Defendants' "'intentional' actions "were expressly aimed at Alabama based on [Defendants'] knowledge that the 'brunt of the injury' would be felt by Norment in Alabama," (Opp'n to Mot. Dismiss 10), also fails to sustain Norment's burden of proving personal jurisdiction over each Defendant.

motion and "negat[e] the required minimum contacts with Alabama." (Br. in Supp. Mot. Dismiss 2.)   In response, Norment contends that it has submitted evidence which demonstrates sufficient minimum contacts to justify the court's exercise of specific personal jurisdiction over each Defendant. (*See generally* Opp'n to Mot. Dismiss 1-16.)

A.   <u>Minimum Contacts</u>

Two types of contacts can form the basis for personal jurisdiction: general and specific. *See Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 n.3 (11th Cir. 2006). Norment predicates its arguments only upon the theory of specific personal jurisdiction. (Opp'n to Mot. Dismiss 1.) "Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (citation omitted); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-75 (1985). The Eleventh Circuit has held that, for purposes of assessing specific personal jurisdiction, minimum contacts are constitutionally sufficient when three criteria are met: "First, the contacts must be related to the plaintiff's cause of action or have given rise to it." *Vermeulen,* 985 F.2d at 1546 (citing *Burger King*, 471 U.S. at 472). "Second, the contacts must involve 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "Third, the defendant's contacts with the forum must be 'such that [the defendant] should reasonably anticipate being haled into court there.'" *Id.* (quoting

12

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Moreover, "it is

important to remember that the conduct at issue is that of the defendants.  No plaintiff can

establish jurisdiction over a defendant through his own actions."  *Ruiz de Molina v. Merritt*

*& Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1356 (11th Cir. 2000).

        Here, the parties focus mainly on the second *Vermeulen* factor, *i.e.*, the requirement

that the contacts involve "some act by which the defendant purposefully avails itself of the

privilege of conducting activities within the forum," 985 F.2d at 1546.  Norment argues that

the purposeful availment requirement is met under two theories.  First, as to Granger,

Norment contends that the purposeful availment requirement is satisfied under the

"contracts-oriented . . . test," *Licciardello v. Lovelady*, 544 F.3d 1280, 1286 (11th Cir. 2008).

(Opp'n to Mot. Dismiss 7-8.)  Second, as to Granger and the rest of the Defendants, Norment

argues that, pursuant to the "effects test" set out in *Calder v. Jones*, 465 U.S. 783 (1984),

personal jurisdiction attaches to all Defendants, given that Norment's claims involve

intentional torts.  (Opp'n to Mot. Dismiss at 9-15.)  Replying, Defendants argue that

Norment's arguments "rest[] entirely on [a] misplaced theory that personal jurisdiction may

be exercised on the basis of an alleged injury to an Alabama resident and on sporadic and

attenuated communications." (Reply 1-2.) Defendants contend that there simply are no facts

demonstrating that any Defendant "purposefully directed [its or his] activities to Alabama."

(Reply 2.)  Defendants further emphasize that they are citizens of states other than Alabama,

conduct no business in Alabama, and have no offices, agents, employees or property in

Alabama.  (Br. in Supp. Mot. Dismiss 9; Reply 2.)  Defendants have the more compelling side of the argument.

       1.    *Purposeful Availment through the Contractual Relationship:  Granger*

Norment argues that its contacts with Granger pertaining "to the Massachusetts Subcontract constitute sufficient minimum contacts with Alabama such that Granger could reasonably anticipate being haled into an Alabama court."  (Opp'n to Mot. Dismiss 7.) Extrapolated from the evidence, those contacts upon which Norment relies are as follows: (1) The Massachusetts Subcontract was "executed" by Norment in Alabama (Sasser Aff. ¶ 8); (2) during the performance of the subcontracts, representatives and employees of Granger "conducted numerous communications" with representatives and employees from Norment in Alabama (Sasser Aff. ¶ 9); (3) payments owed by Granger were to be paid into a single account controlled by Norment at its corporate headquarters in Alabama (Sasser Aff. ¶ 17); (4) Granger "transmitted" five documents pertaining to the subcontract to Norment in Montgomery, Alabama (Sasser Aff. ¶ 10); (5) there were "several telephone conversations" between Granger and personnel with Norment's sales and estimating department in Montgomery, Alabama, related to the Massachusetts Project (Sasser Aff. ¶ 10); (6) Norment "completed" more than one-third of the "total scope [of] work related to security electronics for the Massachusetts Project at its headquarters in Montgomery, Alabama" (Sasser Aff. ¶ 12 (brackets added)); and (7) three invoices submitted by Norment requested that payments be

sent to its Montgomery, Alabama address.  (Sasser Aff. ¶ 10).  (*See generally* Opp'n to Mot. Dismiss 7-8.)

As stated, Defendants focus on *Vermeulen*'s purposeful availment requirement.[6]  They disagree that the evidence upon which Norment relies is sufficient to demonstrate purposeful availment.  They argue generally that "[b]usiness entities routinely enter into construction contracts with parties from a state different from the one in which the entity is located and often those contracts involve construction projects located in yet another state," and that "[i]f simply entering a contract established personal jurisdiction in the plaintiff contracting party's forum, forcing the contracting parties to be haled into distant forums, surely interstate contracting would be stifled" (Reply 2-3), thus, the requirement of "'purposeful availment'" in the forum state (Reply 3 (citation omitted)).

Defendants do not cite any precedential opinions, but do cite a number of cases from other jurisdictions for the proposition that "courts have found no personal jurisdiction under

---

[6] Defendants do not challenge the first prong of the *Vermeulen* test, *i.e.*, whether these contacts are related to or gave rise to Norment's breach of contract action against Granger, *see Vermeulen*, 985 F.2d at 1546, but at least one circuit has interpreted this hurdle as relatively low.  *See Ziegler v. Indian River County*, 64 F.3d 470, 474 (9th Cir. 1995) (assessing the "arising from" issue in terms of "but for" causation); *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1346 (S.D. Fla. 2002) (finding that, "even if the contacts were non-essential to the cause of action, they still may show a sufficient nexus with the litigation to satisfy [*Vermeulen*'s] first step).

similar construction contract circumstances."[7]    (Reply 3-4.)   In one such case, *Ellicott*

*Machine Corp. v. John Holland Party Limited*, 995 F.2d 474 (4th Cir. 1993), the Fourth

Circuit held that a Maryland federal district court did not have specific personal jurisdiction

over an Australian company sued for breach of contract by a Maryland manufacturer of

mining dredges.  *Id.* at 476.  The court recognized that the Australian company "purposefully

initiated" contact with the Maryland manufacturer, requesting the opportunity to bid on a

subcontract for the assembly of a mining dredge (manufactured in Maryland) at a mining site

in Australia, and that the contract was formed after back-and-forth negotiations by telephone

and fax between the companies from their respective jurisdictions.  *Id.* at 478.

The Fourth Circuit reiterated initially "that a contract in and of itself does not

automatically constitute sufficient minimum contacts to support personal jurisdiction," *id.*

at 478 (citing *Burger King*, 471 U.S. at 478), and held that the contacts directed toward the

---

[7] Norment does not cite any cases on the proposition, nor does Norment attempt to distinguish the cases cited by Defendants.  (Opp'n to Mot. Dismiss 7-8.)  One case relied upon by Defendants, however, is distinguishable because the personal jurisdiction analysis was based upon general, not specific, jurisdiction.  *See Builder's Res., Inc. v. Coreslab Structures (Conn), Inc.*, 538 F. Supp. 2d 324, 328 (D. Mass. 2008).  Another case focused principally upon general personal jurisdiction based upon the plaintiff's reliance on an internet website as demonstrating continuous and systematic contact in the forum state; the analysis of specific personal jurisdiction justifiably was rejected in short fashion, but at the same time the limited facts restrict that case's utility.  *See Veliz v. Americorp Builders, Inc.*, No. 06-4363, 2007 WL 1746248, at *3 (D.N.J. June 15, 2007).  In yet another case, the specific personal jurisdiction issue was presented in the context of a declaratory judgment action, and "the declaratory judgment action d[id] not arise out of the [out-of-state corporation's] [forum] contacts."  *Transcon. Ins. Co. v. E. Steel Constructors, Inc.*, No. CCB 07-2243, 2008 WL 2466558, at *3 (D. Md. June 10, 2008).  It was the "contacts surrounding the insurance policy, not contacts involving the [underlying] construction project or the subcontract agreement," which were relevant to the issue of specific personal jurisdiction.  *Id.* at *4 (brackets added).  The conclusions reached in other cases cited by Defendants flow from application of state jurisdictional statutes and arguably are distinguishable from federal constitutional analysis notwithstanding the conceptual similarity.

forum state by the Australian company did not have a "'*substantial* connection' with

Maryland," *id.* at 478 (quoting *Burger King*, 471 U.S. at 479), so as to warrant the conclusion

that the Australian company "purposefully 'availed [itself] of the privilege of conducting

business [in Maryland],'"[8] *id.* at 477 (quoting *Burger King*, 471 U.S. at 476).    The

"significance of these contacts" was "mitigated" by other facts.  *Id.* at 478.  Namely, the

contract, which called for the assembly of the Maryland-manufactured mining dredge in

Australia, was performed in Australia, not Maryland.  *Id.*  The contract was not the product

of a "longstanding business relationship" between the companies, *id.*; to the contrary, the

Australian's company's "contacts with [the Maryland company] in Maryland" constituted its

"sole venture into the [forum] state."  *Id.*  The contract, which took four months to complete,

"did not contemplate a long-term relationship" between the two entities.  *Id.*  There was no

choice-of-law provision, requiring the application of Maryland law to any dispute, and the

Australian company did not conduct any business or advertise in Maryland or have an office

or property in Maryland, and it had no employees or agents in that state.  *Id.*

   *Ellicott Machine* relied on *Burger King,* a landmark decision on specific personal

jurisdiction in contract cases.  *See Ellicott Mach.*, 995 F.2d at 478 (citing *Burger King*, 471

U.S. at 478).  In *Burger King*, the franchisor (Burger King), a Florida citizen, brought a

breach-of-contract suit in a federal district court in Florida.  *See* 471 U.S. at 464 & 468.  The

franchisees were Michigan citizens, who operated a Burger King franchise in Michigan.  *See*

---

   [8] Maryland's long-arm statute, like Alabama's, "extend[s] personal jurisdiction to the limits
allowed by federal due process[.]"  *Ellicott Mach.*, 995 F.2d at 477.

*id.* at 466-67 & 469.  The issue before the Supreme Court was whether the Florida federal

district court's assertion of specific personal jurisdiction over one of the Michigan

franchisees "for the alleged breach of his franchise agreement . . . offend[ed] due process."

*Id.* at 478.

The Supreme Court discussed the "purposeful availment" component of the specific

jurisdiction, minimum contacts analysis, beginning with a quotation from *Hanson v. Denckla*,

357 U.S. 235 (1958):

> "The unilateral activity of those who claim some relationship with a
> nonresident defendant cannot satisfy the requirement of contact with the forum
> State.  The application of that rule will vary with the quality and nature of the
> defendant's activity, but it is essential in each case that there be some act by
> which the defendant purposefully avails itself of the privilege of conducting
> activities within the forum State, thus invoking the benefits and protections of
> its laws."

*Burger King*, 471 U.S. at 475 (quoting *Hanson*, 357 U.S. at 253).  The *Burger King* Court

continued:

> This "purposeful availment" requirement ensures that a defendant will not be
> haled into a jurisdiction solely as a result of "random," "fortuitous," or
> "attenuated" contacts, or of the "unilateral activity of another party or a third
> person . . . .  Jurisdiction is proper, however, where the contacts proximately
> result from actions by the defendant *himself* that create a "substantial
> connection" with the forum State.  Thus where the defendant "deliberately"
> has engaged in significant activities within a State, or has created "continuing
> obligations" between himself and residents of the forum, he manifestly has
> availed himself of the privilege of conducting business there, and because his
> activities are shielded by "the benefits and protections" of the forum's laws it
> is presumptively not unreasonable to require him to submit to the burdens of
> litigation in that forum as well.

*Id.* at 475-76 (internal citations and footnotes omitted).  Applying these principles, the Court noted "[a]t the outset" that "an individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum."  *Id.* at 478.  The Court, however, recognized that a contract is generally preceded by past negotiations and future relationships, and that "[i]t is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum," *id.* at 479.

The Court concluded that, notwithstanding that the franchisee had "no physical ties to Florida," *id.*, the "franchise dispute grew directly out of a 'contract which had a *substantial* connection with that State,'" *id.*  The franchisee "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization." *Id.* at 479-80.  The franchise agreement, which covered a twenty-year period, contemplated "continuing and wide-reaching contacts with Burger King in Florida." *Id.* at 480.  "In light of [the franchisee's] voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the 'quality and nature' of his relationship to the company in Florida can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.'" *Id.*

19

Moreover, in *Burger King*, the Court considered the fact that the contract provided that "Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami." *Id.* Also relevant, albeit not dispositive, was the fact that the franchise agreement contained a choice-of-law provision "providing that all disputes would be governed by Florida law." *Id.* at 481; *see also id.* at 482 (The franchisee "'purposefully availed himself of the benefits and protections of Florida's laws' by entering into contracts expressly providing that those laws would govern franchise disputes." (citation omitted)).

In light of the foregoing principles, it is clear that Granger's formation of a contract with Norment is not sufficient, standing alone, to subject Granger to personal jurisdiction in an Alabama federal district court. *Id.* at 478. Also, Granger has no physical connection with Alabama; it does not conduct business in Alabama, nor does it have an office, agents, employees, or property in Alabama. It does not advertise in Alabama. In addition, as in *Ellicott Machine*, there is no evidence that the Massachusetts Subcontract was formed as a result of a "longstanding business relationship" between Norment and Granger. 995 F.2d at 478. There is, however, evidence that Granger "has never done any general contracting in the [s]tate of Alabama" or "been licensed or authorized to do business in Alabama." (Robert W. Granger Jr. Aff. ¶ 3.) There also is no evidence that the contract "contemplate[d] a long-term relationship" between Norment and Granger, *Ellicott Mach.*, 995 F.2d at 478,

much less a twenty-year contractual relationship as contemplated between the parties in *Burger King*, *see* 471 U.S. at 480.

Norment also has not presented evidence of any foreseeable contract-related future consequences in Alabama. Unlike in *Burger King*, the Massachussets Subcontract does not contain a choice-of-law provision, *see id.* at 481; there is no requirement that the parties apply Alabama law to any dispute. There is no contractually-designated forum for arbitration. In fact, in Defendants' favor, the mediation clause in the Massachussets Subcontract provides that mediation "shall be held in the place where the Project is located [*i.e.*, Massachusetts], unless another location is mutually agreed upon." (Massachusetts Subcontract at 7 (brackets added).)

Norment is correct that the physical absence of a defendant in the forum state does not necessarily insulate it from the personal jurisdiction of the forum court. *See Burger King*, 471 U.S. at 476. "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* Norment, thus, argues that other contacts demonstrate a substantial connection between Granger and Alabama. (Opp'n to Mot. Dismiss 7-8.)

Norment points to the fact that the Massachusetts Subcontract was "executed" by Norment in Alabama. (Sasser Aff. ¶ 8.) Initially, it cannot reasonably be inferred from Norment's lone use of the word "execute" – and Norment has not defined "execute" – that

Granger's agents also signed the contract in Alabama; the evidence establishes, without contradiction, that Granger's representatives did not physically set foot in Alabama in connection with the Massachusetts Subcontract or otherwise conduct any business in Alabama (Robert W. Granger Jr. Aff. ¶ 2; Stephen J. Granger Aff. ¶¶ 2-3). Norment's signing of the contract in Alabama is an act by the plaintiff, not by the defendant, but, in the personal jurisdiction analysis, "the conduct at issue is that of the defendants. No plaintiff can establish jurisdiction over a defendant through his own actions." *Ruiz de Molina*, 207 F.3d at 1356; *see also Burger King*, 471 U.S. at 474 ("'The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" (quoting *Hanson*, 357 U.S. at 253)).

Moreover, Norment has not provided any facts about what acts preceded the signing of the Massachussets Subcontract or who initiated those acts, acts which the *Burger King* Court deemed highly relevant to the specific personal jurisdiction analysis, *see* 471 U.S. at 479. By comparison, there was evidence in *Burger King* that the franchisee actively sought contract negotiations with Burger King in Florida. *See id.* Also, even in *Ellicot Machine*, where the contacts were constitutionally inadequate, there was evidence that the out-of-state defendant initiated certain pre-contract contacts with the forum plaintiff. *See* 995 F.2d at 478.

Norment also says that it "completed" more than one-third of the "total scope [of] work related to security electronics for the Massachusetts Project at its headquarters in

Montgomery, Alabama." (Sasser Aff. ¶ 12 (brackets added).) Again, Norment relies on its unilateral act in the forum state as the basis for subjecting Granger to personal jurisdiction in Alabama. The Massachusetts Subcontract, however, contains no terms as to where Norment was to complete the "scope [of] work" for the "security electronics." The contract instead provides that Norment will "furnish" the equipment and "install" it in a Massachusetts facility. (*See* Massachussets Subcontract (Ex. 2 to Opp'n to Mot. Dismiss 4).) In other words, the Massachussets Subcontract contemplated that Norment would conduct business in Massachussets by furnishing and installing specified equipment at the Barnstable County Jail & House Correction in Bourne, Massachusetts.

Furthermore, Norment points out that, during the performance of the subcontract, representatives and employees of Granger "conducted numerous communications"[9] with representatives and employees from Norment in Alabama, (Sasser Aff. ¶ 9), and that there were "several telephone conversations" between Granger and personnel with Norment's sales and estimating department in Montgomery, Alabama, related to the Massachusetts Project (Sasser Aff. ¶ 10). Norment, however, omits a salient fact: It has not indicated which party – Norment or Granger – initiated the communications. Hence, it cannot be determined whether Granger "purposefully directed" its actions toward Norment in Alabama by initiating these communications. *Burger King*, 471 U.S. at 472; *see also id.* at 475 (Personal "[j]urisdiction is proper . . . where the contacts proximately result from actions by the

_____

[9] Because the evidence establishes that Granger, through its agents, was never physically present in the state of Alabama, these communications were not face-to-face.

defendant *himself* that create a 'substantial connection' with the forum State." (citation omitted)).  In addition to failing to say who initiated the contract communications, Norment does not explain why these contacts were made.  The lack of factual detail substantially depletes the value of this affidavit testimony in the personal jurisdiction analysis.

Finally, Norment says that Granger "transmitted" five contract-related documents to Norment in Montgomery, Alabama.  It also points out that the payments owed by Granger were to be paid into a single account controlled by Norment at its corporate headquarters in Alabama (Sasser Aff. ¶ 17), and similarly, that three contract-related invoices submitted by Norment to Granger requested that payments be sent to its Montgomery, Alabama address. (Sasser Aff. ¶ 10.)  While these contacts are not to be ignored, *see Burger King*, 471 U.S. at 480, the court finds that they are not enough to tip the scale in Norment's favor on the question of purposeful availment.  *Cf. Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1059 (11th Cir. 1986) (recognizing that, in the buyer-seller scenario, "'the making of payments in the forum state'" is a "'secondary or ancillary factor[]'" in the personal jurisdiction equation (quoting *Scullin Steel Co. v. Nat'l Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir. 1982)); *Aeropower, Ltd. v. Matherly*, 511 F. Supp. 2d 1139, 1156 (M.D. Ala. 2007) (finding that "telephone, fax, mail and wire communications" between the non-resident defendant and the forum plaintiff did not satisfy the second *Vermeulen* prong).

On this record, having balanced the factors for and against a finding of purposeful availment, the court is not persuaded that Norment's evidence – which comprises Norment's

unilateral acts, some long-distance communications between the parties (unaccompanied by evidence of which party initiated the contact), Granger's transmission of five documents to Norment in Alabama, and notice to Granger that contractual payments would be received by Norment in Alabama – is sufficient to meet Norment's burden of establishing purposeful availment. Considering the quality, nature, and extent of Granger's contacts with Alabama, as well as the relationship between those contacts and the instant litigation, Granger's limited contacts with Alabama cannot support a finding of purposeful activity invoking the benefits and protections of Alabama under the "contracts-oriented . . . test," *Licciardello*, 544 F.3d at 1286. Rather, the court finds that the "nature and quality and the circumstances" of Granger's purposeful contacts with Alabama "create only an 'attenuated' affiliation with the forum." *Burger King*, 471 U.S. at 476 n.18 (citations omitted).

       2.    *Purposeful Availment through Intentional Torts*: *Calder's Effects Test*

Norment argues that, as to the causes of action alleging intentional torts, personal jurisdiction over each Defendant is proper under *Calder*, *see* 465 U.S. at 783. Norment cites *Calder* for the proposition that "[a] tortious act performed in a non-forum state that results in injury in Alabama makes the exercise of jurisdiction over the actor in Alabama proper." (Opp'n to Mot. Dismiss 9.) In *Calder*, a libel action was brought in a California court against two Florida defendants, a writer and the editor of the *National Enquirer Magazine*. *See* 465 U.S. at 784-85. The alleged libelous article was written and edited in Florida and published in the Florida-based national tabloid magazine. *See id.* at 784-86. Holding that the

California court could exercise personal jurisdiction over the Florida defendants, the Court explained that the "focal point" of the article "concerned the California activities of a California resident," *id.* at 788-89, that the magazine's largest circulation was in California, *id.* at 790, and that the "brunt of the harm, in terms both of [the plaintiff's] emotional distress and the injury to her professional reputation," was endured by the plaintiff in California, *id.* at 789. Jurisdiction, thus, was proper in California based on the "'effects'" of the defendants' Florida conduct in California. *Id.* at 790 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297-98).

The Eleventh Circuit has not had the occasion to apply the *Calder* effects test in a context factually similar to the one presented here. In *Licciardello,* recognizing that "[m]any courts have employed the *Calder* 'effects' test when the plaintiff's claim involves an intentional tort," 544 F.3d at 1286 (collecting cases), the Eleventh Circuit applied the effects test to determine personal jurisdiction over a non-resident defendant alleged to have committed trademark infringement,[10] *id.* at 1287-88. Norment recognizes (Opp'n to Mot.

---

[10] The Eleventh Circuit found the *Calder* effects test satisfied. *See Licciardello*, 544 F.3d at 1287-88. *Licciardello*, however, is distinguishable. A dispositive fact present in that case, which is not present here, was the use of the internet as the vehicle through which the intentional tort was accomplished. *Id.* The Eleventh Circuit explained,

> We hold only that where the internet is used as a vehicle for the deliberate, intentional misappropriation of a specific individual's trademarked name or likeness and that use is aimed at the victim's state of residence, the victim may hale the infringer into that state to obtain redress for the injury. The victim need not travel to the state where the website was created or the infringer resides to obtain relief.

*Id.* at 1288 n.8.

Dismiss 10), as the *Licciardello* court did, that "the Ninth Circuit [has] explained that 'something more' is required under *Calder* than the mere 'foreseeability' that an act may have effects in the forum, and [has] concluded that *Calder* requires that the defendant 'expressly aim' his wrongful conduct, individually targeting a known forum resident," *Licciardello*, 544 F.3d at 1287 (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000)); *see also Rhodes v. Unisys Corp.*, 170 F. App'x 681, 684 & 685 (11th Cir. 2006) ("The *Calder* effects test is a lens through which the connectivity between defendant, cause of action, and forum state may be viewed[,] and "[a] single email contact with a forum, especially when the email is unrelated to the causes of action, will not provide a basis for personal jurisdiction.").

In addition to its recognition that connectivity under *Calder* requires "something more" than foreseeability of injury in the forum state, Norment concedes that application of the *Calder* effects test is fact intensive and that "each cause of action [must be reviewed] to ascertain whether any claim 'sufficiently connect[s]' the out-of-state defendant to the forum state for [specific] personal jurisdiction purposes." (Opp'n to Mot. Dismiss 10 (brackets added) (quoting *Rhodes*, 170 F. App'x at 684).)

It is true that each Defendant is alleged to have committed at least one intentional tort.[11]   Norment has presented its arguments in support of the application of the *Calder*

---

[11] A claim for intentional interference with contractual relations is brought against Northern and the individual Granger Defendants based on allegations that, although not parties to the Massachusetts Subcontract, they were aware of it (Compl. ¶ 35), and that they "intentionally interfered with the Massachusetts Subcontract between Norment and Granger by withholding payment on the Massachusetts

effects test on a claim-by-claim basis (Opp'n to Mot. Dismiss 10-15), and the court has considered carefully those arguments.  The crux of Norment's position is that each Defendant knew that intentional actions which resulted in the "withholding of funds" under the subcontracts at issue (Opp'n to Mot. Dismiss 11) or "threaten[ed] Northern's ability to continue in business and pay its legitimate creditors, including Norment," would financially impact "an Alabama resident [*i.e.*, Norment] in the [s]tate of Alabama," (Opp'n to Mot. Dismiss 14 (brackets added); *see also* Opp'n to Mot. Dismiss 12), and that this financial impact would "result[] in injury to an Alabama resident in the [s]tate of Alabama" (Opp'n to Mot. Dismiss 14).  Norment cites various evidence which it submitted in opposition to Defendants' motion to show that each Defendant knew that Norment was located in Alabama.  (*See generally* Opp'n to Mot. Dismiss 11-14).  Defendants, however, argue that "Norment's status as a plaintiff Alabama corporation does not correspondingly establish personal jurisdiction over [] [D]efendants.  If injury to the plaintiff were enough to establish

---

Subcontract purportedly due to a dispute in the New Hampshire Subcontract." (Compl. ¶ 36; *see generally* Compl. ¶¶ 34-37.)  There also is a conversion claim, alleging that the withholding of funds by Northern, Granger and the individual Granger Defendants under all three subcontracts at issue constitutes a wrongful taking and an appropriation of payment lawfully owed to Norment. (Compl. ¶¶ 40-44.)  A fraudulent transfer claim lies against Consigli, Northern and the individual Granger Defendants. (Compl. ¶¶ 47-53.)  That claim alleges that the individual Granger Defendants "caused" Northern to sell to Consigli three "valuable" contracts "at far less than their fair market value" (Compl. ¶¶ 47-48), thereby hindering Northern's ability to pay Norment under the "subcontracts" (Compl. ¶ 49).  Northern and the individual Granger Defendants also are the subject of a deceptive trade practice claim. (Compl. ¶¶ 56-58.)  That claim alleges that the transfer to Consigli of three "valuable contracts . . . for less than their fair market value" (Compl. ¶ 56) was fraudulent and "constitute[d] a misleading and/or deceptive practice in the conduct of trade or commerce," which "damaged" Norment (Compl. ¶¶ 56-58).  Finally, the individual Granger Defendants are sued on the basis that they are the alter egos of Northern and Granger (Compl. ¶¶ 26-32) and that they "used their control over . . . Northern and Granger to cause" these corporate entities "to commit . . . wrongful [tortious] acts against [Norment]" (Compl. ¶ 30).

personal jurisdiction, it is difficult to imagine any circumstance that would allow a defendant to challenge its exercise."  (Reply 2.)

Assuming that Norment's evidence demonstrates that Defendants knew that Norment would suffer an adverse economic impact in Alabama if payments ceased on the subcontracts at issue, that knowledge may well equate "foreseeability" of a forum effect, but at the same time begs the question of whether there is "'something more.'"  *Licciardello*, 544 F.3d at 1287 (quoting *Bancroft & Masters, Inc.*, 223 F.3d at 1088); *Burger King*, 471 U.S. at 474 ("Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." (internal footnote omitted) (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 295).  Indeed, Norment recognizes that "something more" requires conduct by a defendant that is "'expressly aimed' at the forum state" (Opp'n to Mot. Dismiss 10 (citation omitted)), but Norment's argument meets itself coming back because it relies solely upon Defendants' knowledge of Norment's state of citizenship.  Namely, Norment says that Defendants' "intentional actions were expressly aimed at Alabama *based on their knowledge* that the "'brunt of the injury' would be felt by Norment in Alabama." (Opp'n to Mot. Dismiss 10 (emphasis added).)  Norment points to nothing more to demonstrate that Defendants expressly aimed their allegedly tortious acts at Alabama.

The obviousness of the absence of "something more" as to Consigli is stark.  In *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997), which is instructive as to the *Calder* effects test's inapplicability to Consigli, a South Carolina citizen, commenced a lawsuit in a South Carolina federal district court, alleging that an out-of-state corporate defendant participated in an intentional tort to appropriate the plaintiff's trade secrets and customer lists.  *See id.* at 620.  The only South Carolina "contact" was the defendant's knowledge that its acquisition of the plaintiff's trade secrets could result in lowered sales for the plaintiff.[12]  *Id.* at 625.  The Fourth Circuit concluded that the defendant's knowledge was "too attenuated to constitute a 'substantial connection' with South Carolina."  *Id.*  Standing alone, that knowledge also did not "manifest behavior intentionally targeted at and focused on South Carolina," as required under *Calder*.  *Id.*  The Fourth Circuit further reasoned that, while admittedly a corporation "feels" lost sales at its headquarters, permitting *Calder* to be satisfied on this basis would mean that in intentional tort cases "jurisdiction would depend on a *plaintiff's* decision about where to establish residence," *id.* at 626, thereby "always mak[ing] jurisdiction appropriate in a plaintiff's home state, for the plaintiff *always* feels the impact of the harm there, *id.*

Here, Consigli, a Maine citizen, entered into a contractual relationship with Northern, also a Maine citizen, for the purchase of Northern's rights under three contracts – contracts

---

[12] The out-of-state corporate defendant had "no offices or sales representatives in South Carolina; it ha[d] no property in South Carolina; it ha[d] no phone listings there; . . . it ha[d] never paid South Carolina taxes"[;] no employee ha[d] ever traveled to South Carolina"; and "it had never targeted formal advertising at South Carolina."  *ESAB Group*, 126 F.3d at 621.

which had nothing to do with the Massachusetts Subcontract, the Vermont Subcontract or the New Hampshire Subcontract at issue in this case.  There is no evidence that any relations between Consigli and Northern were carried out in Alabama.  Similar to the out-of-state corporate defendant in *ESAB Group*, the only potential Alabama contact related to this suit is that Consigli allegedly knew that, if it purchased certain contracts from Northern "at far less than fair market value," (Compl. ¶ 14), that these purchases may affect Northern's ability to meet its financial obligations under contracts with third parties, which would include Northern's ability to pay Norment under the Vermont Subcontract and the New Hampshire Subcontract. Other than Consigli's arguable knowledge of potential economic harm to Norment in Alabama, there is no other "connectivity between [Consigli], cause of action, and forum state," *Rhodes*, 170 F. App'x at 685.  To reiterate, the evidence establishes that Consigli had no relationship with the state of Alabama or with Norment.  Consigli was not involved with either the Vermont Project, the New Hampshire Project, or the Massachusetts Project.  (Lerner Aff. ¶ 4.)  Rather, as stated, Consigli's contractual relationship was with Northern (Lerner Aff. ¶ 2), and the contracts that Consigli assumed from Northern did not involve Norment or have any connection with the state of Alabama.  (Lerner Aff. ¶ 2.)  The evidence also establishes, without dispute, that Consigli had no business dealings with Norment in Alabama (Lerner Aff. ¶ 5), and was not licensed to do business in Alabama (Lerner Aff. ¶ 3).  It also never has owned property in Alabama, had a mailing address or a

bank account in Alabama, paid taxes or advertised in Alabama, or employed an Alabama worker.  (Lerner Aff. ¶ 3.)

Furthermore, as relates to Granger's, Northern's and the individual Granger Defendants' potential tort liability, which finds its genesis in the contractual relationships between these Defendants and Norment, the three construction projects at issue were located in Vermont, Massachusetts and New Hampshire, not in Alabama, and the alleged tort wrongdoing by these Defendants was wrought by them in states other than Alabama.  On this record, the court finds that Defendants have the more persuasive argument when they say that the "focal point," for purposes of the *Calder* inquiry, is "not Alabama," but instead "the three public works construction projects in Vermont, Massachusetts, and New Hampshire[.]" (Reply 5); *see also Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1387 & 1388 (8th Cir. 1993) (concluding that *Calder*'s effects test is of "little help" when the "'focal point' of the alleged wrongdoing" occurred outside of the forum even where the "effects of the harm" occurred in that state).  Stated differently, in the words of *Rhodes*, Norment has not argued or presented evidence that the limited Alabama contacts that Northern, Granger and the individual Granger Defendants had with Alabama were "focused on causing injury in Alabama," 170 F App'x at 684, or were intended to inflict economic injury upon Norment in Alabama.  To the contrary, the Alabama contacts appear to be routine contacts made for the purpose of furthering, not severing, the parties' contractual relationship, and occurred

more than a year prior to June, 2005, when payments ceased to Norment under the three subcontracts at issue.[13]  (Sasser Aff. ¶ 16.)

Moreover, at least one circuit court of appeals has distinguished the facts of *Calder* on a ground salient to this case.  *Calder* involved a libel claim, and, thus, "the actual tort or injury, not just its consequences, occurred within the forum."  *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 624 (1st Cir. 2001).  In *Swiss American Bank*, as here, the acts providing the predicate for the alleged tortious conversion and breach of contract happened in the foreign jurisdiction, not in the forum state.  *Id.* at 624-25; *see also Ashton v. Florala Mem'l Hosp.*, No. 2:06cv226, 2006 WL 2864413, at *10 n.7 (M.D. Ala. Oct. 5, 2006) (noting that the First Circuit "has concluded that the case for applying the [*Calder*] 'effects' theory is not as strong where the tort did not occur in the forum state" (quoting *Swiss Am. Bank*, 274 F.3d at 624-25)).

In sum, on this record, the court finds that as to each Defendant, Norment has offered only allegations and evidence of an in-forum adverse effect felt by Norment as a result of the alleged intentional conduct of Defendants.  Accordingly, the court rejects Norment's argument that constitutionally sufficient contacts are satisfied based on the *Calder* effects test.

---

[13] For instance, pertaining to the New Hampshire Subcontract, Northern's Alabama contacts occurred in April, 2004, and consisted of Northern's transmittal of "drawings" and "other correspondence."  (Sasser Aff. ¶ 13.)  Also, as to the Vermont Subcontract, Northern's Alabama contacts transpired prior to January, 2004, and consisted of Northern's transmittal to Norment of contract-related documents.  (Sasser Aff. ¶ 14.)

Having found no purposeful availment, the court notes, but pretermits analysis of, the third prong of the *Vermeulen* analysis. *See* 985 F.2d at 1546 (requiring that "the defendant's contacts with the forum must be 'such that [the defendant] should reasonably anticipate being haled into court there'"). Because Defendants did not purposefully direct their activities at the forum state, their contacts are not "such that [they] could reasonably anticipate being haled into court [in Alabama]." *Id.*

  B. <u>Fair Play and Substantial Justice</u>

Where minimum contacts exist between the defendant and the forum state, the second part of the due process analysis requires consideration of whether the exercise of jurisdiction over the defendant "'offend[s] traditional notions of fair play and substantial justice.'" *Burnham*, 495 U.S. at 618 (brackets added) (quoting *Int'l Shoe Co.*, 326 U.S. at 316). Because the court finds that Defendants do not have the requisite minimum contacts with Alabama necessary to support the exercise of personal jurisdiction over them, the court need not address the fairness tier of the due process inquiry.

  C. <u>Conclusion</u>

Because personal jurisdiction over Defendants is lacking, the court finds that Norment's claims against Defendants must be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

## V.  ORDER

Accordingly, based on the foregoing, it is ORDERED that the Motion to Dismiss (Doc. # 13), filed by the five named Defendants, for lack of personal jurisdiction is GRANTED.

An appropriate judgment shall be entered.

DONE this 23rd day of February 2009.

     /s/   W.  Keith Watkins
UNITED STATES DISTRICT JUDGE